UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| TRACKTHINGS LLC, | |
| Plaintiff, | 21 Civ. 5440 (KPF) |
| -v.- | **OPINION AND ORDER** |
| NETGEAR, INC., | |
| Defendant. | |

KATHERINE POLK FAILLA, District Judge:[1]

Plaintiff TrackThings LLC is the owner of three patents that are integral to the wireless networking technology known as "mesh WiFi."  Plaintiff has sued Defendant NETGEAR, Inc., a purveyor of computer networking hardware, alleging that it sells various mesh WiFi products that infringe on these three patents.  Defendant now moves to dismiss the case for improper venue pursuant to Federal Rule of Civil Procedure 12(b)(3) and 28 U.S.C. § 1400(b) or, in the alternative, to transfer the case to the Northern District of California. For the reasons set forth below, the Court finds that venue in the Southern District of New York is improper and transfers the case to the District of Delaware in the interest of justice.

---

[1]     Maeve O'Brien, a rising second-year student at New York University School of Law and an intern in my Chambers, provided substantial assistance in researching and drafting this Opinion.

## BACKGROUND[2]

### A.    Factual Background

Plaintiff is a New Jersey limited liability company with its principal place of business in Murray Hill, New Jersey.  (Compl. ¶ 1).  Plaintiff was founded as a technology incubator and currently owns dozens of patents spanning the fields of networking, audio and signal processing, mobile, and wireless technology.  (*Id.* at ¶¶ 16-17).  Defendant is a Delaware corporation with its principal place of business in San Jose, California.  (*Id.* at ¶ 2).  While Defendant is headquartered in San Jose, it has had various contacts with the Southern District of New York since at least 2018.  These contacts are the focus of this motion and are described in detail below.

### 1.    Defendant's New York Office

In 2018, Defendant acquired a startup called Meural, which occupied an office on the 11th floor of 625 Broadway, New York, New York (the "625 Broadway Office").  (Wu Decl. (Dkt. #33) ¶ 6; *id.*, Ex. 1 ("Sublease")).  Prior to this acquisition, Defendant did not have a physical office presence in New York. Defendant maintained the lease on the 625 Broadway Office until May 2020,

---

[2]    This Opinion draws its facts from Plaintiff's Complaint ("Compl." (Dkt. #1)), as well as from the materials submitted by the parties in connection with this motion.  *See Rosco Inc.* v. *Safety Vision LLC*, No. 19 Civ. 8933 (JMF), 2020 WL 5603794, at *1 n.1 (S.D.N.Y. Sept. 18, 2020) (explaining that in deciding a motion to dismiss for improper venue, a court "may consider facts and documents outside the complaint").  These materials consist of the declarations submitted by the parties and the exhibits attached thereto, which the Court cites using the convention "[Name] Decl., Ex. [ ]."

For ease of reference, the Court refers to Defendant's memorandum of law in support of its motion to dismiss as "Def. Br." (Dkt. #32); Plaintiff's memorandum of law in opposition to Defendant's motion to dismiss as "Pl. Opp." (Dkt. #44); and Defendant's reply brief as "Def. Reply" (Dkt. #46).

when it opted not to renew it.  (*Id.* at ¶ 6; *id.*, Ex. 2 ("Lease Non-Renewal Letter")).  The sublease for the 625 Broadway Office indicated that Meural maintained another office at 26 King Street, New York, New York.  (Sublease at 1).  However, Meural's records from the New York Department of State, Division of Corporations reveal that Meural has not paid rent for the 26 King Street office since 2016.  (*See* Singer Decl. (Dkt. #42), Ex. I).

Despite terminating the 625 Broadway lease in May 2020, as of September 30, 2021, Defendant's website continued to reflect that its "Americas presence also includes offices in New York City and Richmond — Canada."  (Singer Decl., Ex. D).  Relatedly, as of August 31, 2021, Defendant listed New York City as a searchable location for job openings on its website. (*See* Dkt. #20 at 2).  Defendant maintains that notwithstanding this "stale" information reflected on its website, its San Jose headquarters has been its sole office in the United States since May 2020, when it terminated the sublease for the 625 Broadway Office.  (Wu Decl. ¶¶ 5-6).

### 2. Defendant's Employees in New York

Besides the physical office location that Defendant inherited (and has since abandoned) through its acquisition of Meural, several of Defendant's employees either have resided or currently reside in or near this District.  As an initial matter, Defendant terminated most of the Meural employees in 2019, and only two Meural employees remain affiliated with Defendant.  (Wu Decl. ¶ 8).  As of June 21, 2021 — the date the Complaint was filed — Defendant had in its employ a total of four employees located in the state of New York.

(*See id.* at ¶¶ 8-10).  These four employees work from their homes in New York State, none of which residences is located in the Southern District of New York. (*See id.* at ¶ 10).[3]  As of the date Plaintiff initiated suit, Defendant also had one short-term contractor in Rochester, New York, who worked from May 10, 2021, to July 9, 2021, and one summer intern in New York City, who worked from June 1, 2021, to August 27, 2021.  (*Id.* at ¶ 9).  Defendant represents that it does not own or rent any of its employees' homes in New York, nor does it incentivize them to live within the state.  (*Id.* at ¶ 11).  Rather, it claims to be "indifferent as to where its remote employees choose to reside in the United States." (*Id.*).

With respect to Defendant's further purported contacts in this District, Plaintiff asserts that Defendant owns three patents, which, among them, list four inventors as living in New York City: Jonathan Daub, Vladimir Vukicevic, Or Baron, and Jerry Hu.  (Soni Decl. (Dkt. #35), Ex. ii at 5-6).  All of these patents were filed prior to the commencement of the instant suit, and none of these inventors currently works for Defendant.  Jonathan Daub is listed as an inventor on a patent that was first filed in 2013 (*id.*, Ex. iii), and he stopped working for Defendant in 2018 (Wu Decl. ¶ 14).  The remaining three inventors, Vukicevic, Baron, and Hu, are listed as co-inventors on two patents that were

---

[3]     These employees are (i) Charles Vancherie, National Account Manager, who lives in Monroe County; (ii) Sharon Hartman, Senior Distribution Account Manager, who lives in Erie County; (iii) Poppy Simpson, Senior Manager, Content & Creation (Meural), who lives in Brooklyn; and (iv) Maggie Liu, Senior Software Specialist (Meural), who also lives in Brooklyn.  (Wu Decl. ¶ 10).  Additionally, on September 14, 2021 (after this suit was filed), Defendant hired a fifth employee located in New York State, Candice Anklin, Senior Growth Marketing Manager, who resides in Onondaga County.  (*Id.*).

filed in 2018.  (Soni Decl., Ex. iv-v).  Vukicevic and Hu ceased working for

Defendant in 2019, while Baron left in April 2021.  (Wu Decl. ¶ 8; *see also* Soni

Decl., Ex. vii, viii, ix).

### 3.     Defendant's "Micro-Flagship" at Showfields

Defendant also had a relationship with the independent retailer,

Showfields, located at 11 Bond Street in New York City.  (Friday Decl. (Dkt.

#34) ¶ 4; *see also id.*, Ex. A ("Showfields Agreement")).  Defendant entered into

an agreement with Showfields in March 2019 for a minimum term of four

months.  (Showfields Agreement 5).  The Showfields Agreement provided

Defendant with "a non-exclusive, revocable and non-transferable license to

receive a non-exclusive access to a designated space in the [Showfields]

Premises ... during the official operating hours of the Premises as determined

by Showfields."  (*Id.*, § 1.1).  The agreement permitted Defendant to use the

space assigned to it to "present, demo, give or sell [its] products and brands,"

with pre-approval by Showfields.  (*Id.*, § 1.2).

The Showfields Agreement was styled as a membership plan and offered

Defendant three plan options with varying levels of integration with Showfields.

(*See* Showfields Agreement § 1.3).  Defendant selected the "enhanced

showroom plan," which entitled Defendant to store its products in one of

Showfields's designated inventory rooms and sell up to four styles of products

in the Showfields store.  (*Id.*, § 1.3.2).  All quantities and styles of products

were subject to pre-approval by Showfields.  (*Id.*).  Under this plan, Defendant

was entitled to use a "shared band host," whom Showfields would "hire and

train for an additional fee." (*Id.*).  The agreement also provided Defendant with services to design its designated space at Showfields, including sketches, buildout renderings, and a production deck.  (*Id.*, § 1.4).  Defendant utilized these services to "style[ ] [its space] as a chic faux-living room," (Singer Decl. (Dkt. #42), Ex. K), and advertised the location as Meural's "micro-flagship" (*id.*, Ex. J at 3).

The Agreement obligated Defendant to make monthly membership and staffing fee payments to Showfields, in the amounts of $10,000 and $1,200 respectively.  (Showfields Agreement 5).  Defendant's membership term would automatically renew, unless either party affirmatively terminated the relationship.  (*Id.*, § 2.1).  The agreement gave Showfields "sole and absolute discretion" to revoke the membership, whereas Defendant could terminate its membership by providing written notice to Showfields or by cancelling it online with at least 60 days' notice.  (*Id.*, § 2.2).

On November 21, 2020, a Showfields stock associate emailed Defendant's Senior Business Development Manager to request that Defendant ship additional of its products for sale at the store.  (Friday Decl., Ex. B).  Two days later, one of Defendant's managers replied explaining that Defendant had "closed out with Showfields back in March/April," and directed the store to "sell out [whatever inventory] you have left[.]"  (*Id.*).  Defendant's Accounts Payable System shows that its last monthly payment to Showfields was made in April 2020, for an invoice dated March 2020.  (Wong Decl. (Dkt. #47) ¶ 3; *id.*, Ex. A).

4.      **Defendant's Relationship with B8ta**

Defendant also maintained a relationship with b8ta, a retailer that operates multiple stores in New York City. (*See* Friday Decl., Ex. G at 1-2 (listing locations in Brookfield Place and Hudson Yards)). B8ta first became an authorized reseller of Defendant's products in November 2017, when the parties entered into a "Retail Labs Showroom Agreement" for the "demonstration, marketing and promotion of [Defendant's] products" in b8ta's store located in San Jose. (*See generally id.*, Ex. C). In 2019, Defendant and b8ta entered into a "Master Showroom Agreement," pursuant to which b8ta placed Defendant's products at various of its locations, including Brookfield Place and Hudson Yards in New York City. (*See id.*, Ex. E ("NETGEAR Master Showroom Agreement"); *id.*, Ex. F ("Meural Master Showroom Agreement"); *id.*, Ex. G ("Project Plan")). Defendant was to pay $1,120 per month to place its products at b8ta Hudson Yards and $1,200 per month to place its products at b8ta Brookfield Place. (Project Plan § 5(a)). The initial term length for the product placement was one year, and the agreement automatically renewed unless terminated by either party. (*Id.*, § 4(a)).

Pursuant to their agreement, b8ta provided Defendant with "retail services, including design, display, demonstration, marketing, promotion, and resale" of its products. (NETGEAR Master Showroom Agreement 1; *see also* Project Plan § 6 (outlining b8ta's retail management services)). B8ta retained control over the details concerning product placement within its retail locations, including the placement's display, size, and components, but agreed

7

to collaborate with Defendant during the design phase to ensure the customer experience was consistent with Defendant's branding. (Project Plan § 6(a)(ii)). B8ta also provided Defendant a web-based platform that it could use to view retail analytics and modify the content of its displays and prices of its products at the b8ta stores in real time. (*Id.*, § 6(a)(i)). Defendant's inventory was provided to b8ta on a "consignment basis," meaning that Defendant owned the products until they were sold to the consumer, at which point ownership transferred first to b8ta and then immediately to the consumer. (*Id.*, § 6(b)(ii)). B8ta provided all retail staff, and Defendant had no employees working at either b8ta location in New York City. (*Id.*, § 6(a)(iv); Friday Decl. ¶ 5). Defendant was obligated to provide b8ta staff with "reasonably detailed training and documentation" regarding its products, and to collaborate with b8ta on a plan to market its products. (Project Plan § 6(a)(v)-(vi)). The agreement refers to b8ta as an "independent, nonexclusive reseller" of Defendant's products, characterizes the parties' arrangement as between "independent contractors," and explicitly disclaims any agency relationship. (NETGEAR Master Showroom Agreement §§ 3, 12(b)).

Defendant's Vice President of Cost and Corporate Accounting attests that Defendant's agreement with b8ta ended in or around February 2021, when it last paid b8ta for an invoice, dated October 15, 2020. (Wong Decl. ¶ 4). Defendant's Accounts Payable System reflects that its last payment to b8ta was made on February 11, 2021. (*Id.*, Ex. B).

**B.    Procedural Background**

Plaintiff initiated this action by filing the Complaint on June 21, 2021.

(Dkt. #1).  On August 26, 2021, Defendant submitted a pre-motion letter

indicating its intent to move to dismiss the case for improper venue, or, in the

alternative, to transfer.  (Dkt. #16).  On August 31, 2021, Plaintiff submitted its

own pre-motion letter opposing this motion.  (Dkt. #20).  The Court held a pre-

motion conference on October 1, 2021, at which the parties discussed

Defendant's motion and the supporting evidentiary materials it intended to

submit.  (*See* Minute Entry for Oct. 1, 2021; Dkt. #27 (transcript)).  At the

conference, the Court did not mandate discovery, but warned Defendant that it

bore the onus of producing sufficient evidence to resolve the venue dispute.

(*See* (Dkt. #27).[4]

On November 5, 2021, Defendant filed its motion and supporting papers.

(Dkt. #31-38).  Plaintiff filed its opposition papers on December 3, 2021.  (Dkt.

#41-44).  The briefing closed on December 17, 2021, with Defendant's filing of

its reply brief and additional supporting papers.  (Dkt. #46-51).  Accordingly,

Defendant's motion to dismiss or transfer is ripe for the Court's review.

---

[4]    About a week prior to the October 1, 2021 conference, Plaintiff submitted discovery
requests to Defendant seeking various information regarding its contacts with the
District since 2016, which information Defendant declined to produce.  (*See* Singer
Decl., Ex. A).

## DISCUSSION

The Court begins by assessing the propriety of venue in the Southern District of New York.  After deciding that venue is improper in this District, the Court next determines whether the proper remedy is dismissal or transfer to another district pursuant to Federal Rule of Civil Procedure 12(b)(3) and 28 U.S.C. § 1406(a).  The Court finds that the interest of justice counsel against dismissal and in favor of transfer to the District of Delaware.

## A.     Venue in the Southern District of New York Is Improper

### 1.     Interpreting the Patent Venue Statute

In a patent infringement action, venue is governed exclusively by the patent venue statute, 28 U.S.C. § 1400(b), *see TC Heartland LLC* v. *Kraft Foods Grp. Brands LLC*, 137 S. Ct. 1514, 1519 (2017), which must be interpreted in accordance with the law of the Federal Circuit, *see In re ZTE (USA) Inc.*, 890 F.3d 1008, 1012 (Fed. Cir. 2018).  "[U]pon motion by the Defendant challenging venue in a patent case, the Plaintiff bears the burden of establishing proper venue."  *Id.* at 1013.  Unless the court holds an evidentiary hearing, the plaintiff need only make a *prima facie* showing of venue.  *Peerless Network, Inc.* v. *Blitz Telecom Consulting, LLC*, No. 17 Civ. 1725 (JPO), 2018 WL 1478047, at *2 (S.D.N.Y. Mar. 26, 2018).

When determining whether venue is appropriate under Section 1400(b), courts must be mindful that "patent venue is narrower than general venue — and intentionally so."  *Peerless Network,* 2018 WL 1478047, at *2; *see also TC Heartland LLC*, 137 S. Ct. at 1518 (noting that by creating the patent venue

statute, Congress "placed patent infringement cases in a class by themselves, outside the scope of general venue legislation" (internal citations and quotation marks omitted)).  In conceiving the patent venue statute, "Congress adopted the predecessor to [Section] 1400(b) as a special venue statute in patent infringement actions to eliminate the 'abuses engendered' by previous venue provisions allowing such suits to be brought in any district in which the defendant could be served."  *Schnell* v. *Peter Eckrich & Sons, Inc.*, 365 U.S. 260, 262 (1961) (quoting *Stonite Prods. Co.* v. *Melvin Lloyd Co.*, 315 U.S. 561, 563 (1942)).  Thus, the Supreme Court has explained that the patent venue statute was intended as "a restrictive measure, limiting a prior, broader venue."  *Stonite*, 315 U.S. at 566 (citations omitted).

In this context, the Supreme Court has described the patent venue requirement as "specific and unambiguous … not one of those vague principles which, in the interest of some overriding policy, is to be given a 'liberal' construction."  *Schnell*, 365 U.S. at 264 (citation omitted); *accord In re ZTE*, 890 F.3d at 1014.  Likewise, the Federal Circuit has advised courts to be mindful of Section 1400(b)'s history when applying the statute, and urges caution "not to conflate showings that may be sufficient for other purposes, *e.g.*, personal jurisdiction or the general venue statute, with the necessary showing to establish proper venue in patent cases."  *In re Cray Inc.*, 871 F.3d 1355, 1361 (Fed. Cir. 2017).

### 2.  Timing for Patent Venue under Section 1400(b)

As a threshold matter, the parties dispute the relevant timeframe for the patent venue analysis.  (*Compare* Def. Br. 5-6 (analyzing venue at the time suit was filed), *with* Pl. Opp. 8-9 (analyzing venue at the time infringement claim accrues)).  The Federal Circuit has not determined the point in time at which venue is to be analyzed under Section 1400(b), and a circuit split appears to have emerged on the issue.  *See In re Google LLC*, 949 F.3d 1338, 1340 n.1 (Fed. Cir. 2020) (acknowledging, but not resolving, circuit split on timing for determining patent venue).  One line of cases holds that patent venue should be determined based on the facts that exist at the time the action was filed, as doing so best adheres to the language of Section 1400(b).  *See, e.g.*, *NetSoc, LLC* v. *Chegg Inc.*, No. 18 Civ. 10262 (RA), 2019 WL 4857340, at *2 (S.D.N.Y. Oct. 2, 2019) (holding that patent venue "is to be analyzed based on facts existing at the time th[e] action [i]s commenced"); *cf. Flowers Indus., Inc.* v. *FTC*, 835 F.2d 775, 776 n.1 (11th Cir. 1987) (holding in the context of the general venue statute that "venue must be determined based on the facts at the time of filing").  Other courts have applied the so-called *Welch* rule, which calls for patent venue to be assessed based on the facts that exist at the time the cause of action accrues, so long as a suit is filed within a reasonable time thereafter.  *See, e.g.*, *San Shoe Trading Corp.* v. *Converse Inc.*, 649 F. Supp. 341, 343-45 (S.D.N.Y. 1986) (citing *Welch Sci. Co.* v. *Hum. Eng'g Inst., Inc.*, 416 F.2d 32 (7th Cir. 1969)).  This Court joins the line of cases holding that venue for purposes of the patent venue statute is to be decided at the time the case is brought.

12

Beginning with the text of the patent venue statute, Section 1400(b) provides: "Any civil action for patent infringement may be brought in the judicial district where the defendant resides, or where the defendant has committed acts of infringement and has a regular and established place of business." 28 U.S.C. § 1400(b). The language of the statute contains several indicia that suggest its temporal focus is the time at which a suit is filed. Importantly, the statute refers to where a civil action "may be brought," and the act of "bringing" a civil action refers to the filing a complaint. *See NetSoc, LLC*, 2019 WL 4857340, at *2; *accord Pers. Audio, LLC* v. *Google, Inc.*, 280 F. Supp. 3d 922, 930 (E.D. Tex. 2017). Further, the statute speaks in the present tense by using the term "resides" and the phrase "has a regular and established place of business." Congress's decision to phrase the statute in the present tense connotes an analytical scope for patent venue contemporaneous with the initiation of a patent infringement action. *See Pers. Audio, LLC*, 280 F. Supp. at 930 ("Congress could have used 'has had a regular and established place of business' but chose not to do so.").

Moreover, assessing venue at the time of filing is in keeping with the Federal Circuit's directive that when construing venue under Section 1400(b), "the analysis must be closely tied to the language of the statute." *In re Cray, Inc.*, 871 F.3d at 1362. This reading of patent venue timing under Section 1400(b) is supported by a "chain of strict interpretations of [Section] 1400(b) and its predecessor statutes by the Supreme Court." *Pers. Audio, LLC*, 280 F. Supp. at 931; *see also TC Heartland*, 137 S. Ct. at 1515 (holding that

13

residence under Section 1400(b) refers only to the state of incorporation); *Stonite Products Co.*, 315 U.S. at 563 (holding that Section 1400(b)'s predecessor was the exclusive provision controlling venue in patent infringement proceedings).  Further, a time-of-filing rule is consistent with Section 1400(b)'s "intentional narrowness," reinforced by the Federal Circuit. *In re ZTE (USA) Inc.,* 890 F.3d at 1014.

The Court pauses to note the provenance of the alternative approach to patent venue.  In *Welch Science Co.* v. *Human Engineering Institute, Inc.*, the Seventh Circuit held that patent venue is proper if the defendant had a "regular and established place of business *at the time the cause of action accrued* and the suit is filed within a *reasonable time* thereafter."  416 F.2d 32, 35 (7th Cir. 1969) (emphases added).  In that case, the Seventh Circuit found venue in the Northern District of Illinois to be proper despite the fact that the defendant had sold its allegedly infringing business in the district thirty-seven days before the suit was filed.  *Id.* at 36.  The concern animating the *Welch* rule was that a defendant could "abandon or sell [an established business] without remaining amenable to suit for venue purposes in that district for a reasonable time."  *Id.*

The Court acknowledges the existence of several recent cases that have adopted the *Welch* rule.  *See, e.g.*, *Motorola Sols., Inc.* v. *Hytera Commc'ns Corp. Ltd.*, 402 F. Supp. 3d 450, 455-56 (N.D. Ill. 2019); *Genentech, Inc.* v. *Eli Lilly & Co.*, No. 18 Civ. 1518 (JLS) (JLB), 2019 WL 1923087, at *4 n.7 (S.D. Cal. Apr. 29, 2019); *Precision Fabrics Grp., Inc.* v. *Tietex Int'l, Ltd.*, Nos. 13 Civ. 645 (TDS) and 14 Civ. 650 (TDS), 2017 WL 5176355, at *10 n.15 (M.D.N.C. Nov. 7,

14

2017).  But these cases adopt *Welch*'s accrual standard without engaging in an analysis of the relevant statutory text or of the binding precedent emphasizing the importance of a strict approach to interpreting Section 1400(b).  *See, e.g.*, *In re Cray*, 871 F.3d at 1362 (stressing "that the analysis [of Section 1400(b)] must be closely tied to the language of the statute").  For the reasons just discussed, the time-of-filing rule is the standard more faithful to the language of and the precedent interpreting the patent venue statute.  Accordingly, the Court will assess the propriety of venue in this case as of the date Plaintiff filed the Complaint.

### 3.    Regular and Established Place of Business Under Section 1400(b)

Under Section 1400(b), venue is proper either (i) where the defendant "resides," or (ii) where it "has committed acts of infringement and has a regular and established place of business."  28 U.S.C. § 1400(b).  The Supreme Court spoke unequivocally when it held that a corporate defendant "resides," for the purposes of Section 1400(b), in its state of incorporation.  *TC Heartland*, 137 S. Ct. at 1515.  Thus, there is no dispute that Defendant "resides" in Delaware, where it is incorporated.  (Compl. ¶ 2).  Therefore, for venue to lie in the Southern District of New York, the second prong of Section 1400(b) must apply.

For a defendant to have a "regular and established place of business" to satisfy the second prong of Section 1400(b), courts employ a three-part test: "[i] there must be a physical place in the district; [ii] it must be a regular and established place of business; and [iii] it must be the place of the defendant."  *In re Cray*, 871 F.3d at 1360.  With respect to the first element,

the physical place "need not be a fixed physical presence in the sense of a
formal office or store, [but] there must still be a physical, geographical location
in the district" from which the defendant carries out business. *Id.* at 1362
(internal citations and quotation marks omitted); *see also In re Google LLC*, 949
F.3d at 1343 (holding that a "place" for purposes of the venue statute is not
restricted to a defendant's "real property ownership or a leasehold interest in
real property"). Thus, venue is improper if the "place" is entirely virtual or
comprised of electronic communications from one person to another. *In re
Cray*, 871 F.3d at 1362. Conversely, leased shelf or rack space can serve as a
"place" under Section 1400(b), as can a defendant operating a table at a flea
market. *In re Google LLC*, 949 F.3d at 1343-44; *see also Peerless Network*,
2018 WL 1478047, at *3 (finding equipment occupying a shelf in a facility to
qualify as a "place" for purposes of the patent venue statute).

The second element requires that the defendant's place of business be
"regular and established." To be "regular and established," the place of
business must operate "in a steady, uniform, orderly, and methodical manner."
*In re Cray*, 871 F.3d at 1362 (internal quotation marks and alterations
omitted). The location must be characterized by a sufficient degree of
permanence, and while a business can move locations, it must be stable for a
meaningful period of time. *Id.* at 1363 (noting that the dictionary definition of
"establish" is to "settle certainly, or fix permanently," and that "court decisions
have stressed the importance of sufficient permanence"). A "regular and
established place of business" also "requires the regular, physical presence of

16

an employee or other agent of the defendant conducting the defendant's business[.]" *In re Google LLC*, 949 F.3d at 1345.  An agency relationship requires the following essential elements: "[i] the principal's 'right to direct or control' the agent's actions, [ii] 'the manifestation of consent by the principal to the agent that the agent shall act on his behalf,' and [iii] the 'consent by the agent to act.'" *Id.* (internal alterations omitted) (quoting *Meyer* v. *Holley*, 537 U.S. 280, 286 (2003)).

Finally, the place of business must be "the place of the defendant."  *In re Cray*, 871 F.3d at 1363.  In order to satisfy this prong, the defendant, not merely an employee of the defendant, must establish or ratify the place of business.  *Id.*  Relevant considerations include: "[i] whether the defendant owns, leases, or otherwise exercises control over the premises; [ii] whether the defendant conditioned employment on an employee's continued residence in the district; [iii] whether the defendant stored inventory there to be sold or distributed from that place; [iv] whether the defendant made outward representations that the physical location was its place of business; and [v] how the alleged place of business in the district compares to other places of business of the defendant in other venues."  *NetSoc, LLC*, 2019 WL 4857340, at *3 (quoting *Zaxcom, Inc.* v. *Lectrosonics, Inc.*, No. 17 Civ. 3408 (NGG) (SJB), 2019 WL 418860, at *5 (E.D.N.Y. Feb. 1, 2019)).  In considering the defendant's outward representations, courts may consider "whether the defendant lists the alleged place of business on a website, or in a telephone or other directory; or places its name on a sign associated with or on the building itself."  *In re Cray*,

871 F.3d at 1363-64.  That said, "the mere fact that a defendant has advertised that it has a place of business or has even set up an office is not sufficient [to qualify as a regular and established place of business]; the defendant must actually engage in business from that location."  *Id.* at 1364.

### 4.    Analysis

Plaintiff argues that venue in this District is proper based on Defendant's multiple contacts with the District, including its: (i) physical office location at 625 Broadway (Compl. ¶ 6); (ii) its employees who live in New York City (*id.*); (iii) its "micro-flagship" location at Showfields in New York City (Pl. Opp. 5-6); and (iv) its partnership with two b8ta locations in New York City (*id.* at 6-7).  As the Court will explain, none of these contacts confers venue in this District under Section 1400(b).

### a.    The 625 Broadway Office Does Not Confer Venue

To begin, Plaintiff alleges in the Complaint that venue is proper in this District, in part, because Defendant conducted business operations through the 625 Broadway Office.  (Compl. ¶¶ 2, 6).  In connection with this motion, Defendant produced a letter, dated May 4, 2020, establishing that it terminated its lease for the 625 Broadway Office more than a year before Plaintiff filed the present action.  (*See* Lease Non-Renewal Letter).  In response, Plaintiff pivoted to arguing that because Defendant continued to "tout" its New York City offices on its website long past the termination of the 625 Broadway lease, the true extent of Defendant's New York presence is unknown, thus necessitating venue discovery.  (Pl. Opp. 9-11).

Irrespective of any indication to the contrary on its website, the record evidence reveals that Defendant severed its physical office ties with this District in May 2020.  Defendant has produced a letter informing its landlord of its decision not to renew its lease and further represented that its sole office in the United States is in San Jose and that it has no present intention of re-opening an office in New York State, let alone in this District.  (Wu Decl. ¶¶ 5-6).  Therefore, the Court is assured that, at the time this suit was filed, Defendant had abandoned its physical office presence in New York City.  Any representations on Defendant's website advertising the existence of its New York office are insufficient to surmount the evidence conclusively establishing that Defendant terminated the lease for the 625 Broadway Office in May 2020, over a year prior to the initiation of this suit.  *See In re Cray*, 871 F.3d at 1364 (noting that a defendant's advertisements of a place of business in a district are insufficient to confer venue if it does not actually conduct business at that place).  Assessing venue based on the facts that existed at the time the Complaint was filed, Defendant's former 625 Broadway Office does not confer venue in this District.[5]

---

[5]     Even if the Court were to apply the accrual standard dictated by *Welch*, Plaintiff's reliance on the 625 Broadway Office would still fail to make venue appropriate in this District.  Following the *Welch* rule, venue is determined based on the facts that exist at the time the cause of action accrues, so long as a suit is filed within a reasonable time thereafter.  *See Welch Sci. Co.* v. *Hum. Eng'g Inst., Inc.*, 416 F.2d 32, 35 (7th Cir. 1969).  In *Welch*, 37 days elapsed between when the defendant ceased conducting its allegedly infringing business in the district and the plaintiff brought suit.  The *Welch* Court anchored its holding in what it determined to be "fair and reasonable[,]" motivated by a concern that a defendant could establish an infringing business and then immediately evade suit in that district by leaving.  *Id.* at 35-36.

The avoidance concern animating *Welch* does not apply in the circumstances of this case.  Defendant terminated its lease on the 625 Broadway Office more than a year

### b.     Defendant's New York Employees Do Not Confer Venue

Plaintiff additionally asserts that Defendant's employees located in New York City makes venue in this District proper.  (Compl. ¶ 6; *see also* Pl. Opp. 10-11 & n.5).  Defendant responds that on the day the Complaint was filed it had only four employees living in New York State, all of whom worked from their residences located outside of this District.  (Wu Decl. ¶¶ 8, 10).  Defendant attests that the only individual working for it in New York City at this time was an intern.  (*Id.* at ¶ 9).  Thus, Plaintiff's argument premised on Defendant's employees located within this District would require venue to be conferred through the remote work presence of a single intern.

Although the record before the Court does not shed light on the nature or extent of the intern's contacts with this District, the Court has no trouble concluding that the remote presence of a single intern does not create a "regular and established place of business" of a defendant for purposes of the patent venue analysis.  Indeed, courts have routinely declined to find venue under Section 1400(b) on remote worker ties stronger than those presented here.  For instance, the Federal Circuit concluded in *In re Cray* that the homes of two remote employees were not places *of the defendant* for purposes of the

---

before the present action was filed.  Irrespective of Defendant's motivation for abandoning its New York City office, the Court is aware of no case that has come close to finding that a year qualifies as a "reasonable time" under *Welch*.  *See, e.g.*, *Level Sleep LLC* v. *Dormeo N. Am., LLC*, No. 18 Civ. 120 (RWS), 2019 WL 458467, at *3 (E.D. Tex. Feb. 1, 2019) (finding four months to not be a reasonable time under *Welch*); *Incipio, LLC* v. *Argento SC By Sicura Inc.*, No. 17 Civ. 1974 AG (KESx), 2018 WL 4945002, at *5 (C.D. Cal. July 18, 2018) (deeming six months not to be a reasonable time under *Welch*).  Thus, Defendant's 625 Broadway Office also fails to confer venue in this District under the *Welch* rule.

Section 1400(b) analysis.  871 F.3d at 1364-65.  In arriving at this conclusion,
the Federal Circuit noted that there was no indication that the defendant
owned or leased any portion of the employees' homes; that the employees
stored inventory or conducted demonstrations at their homes; or that the
defendant conditioned the employees' employment on their residence there.  *Id.*
at 1365.  Further, there was no evidence that the defendant believed a location
within the district where the remote workers lived was important to the
business performed, or that it had any intention to maintain a place of
business there if the employees decided to move.  *Id.*  These considerations all
hold true in the present action as well, where Defendant has disavowed any
ownership or leasehold interest in any of its employees' homes and has stated
that it is "is indifferent as to where its remote employees choose to reside in the
United States."  (Wu Decl. ¶ 11).

District courts have followed the Federal Circuit's lead in finding that
venue does not lie in a district based on the mere presence of a remote
employee.  *See, e.g.*, *NetSoc, LLC*, 2019 WL 4857340, at *3 (rejecting the
suggestion that "the home of the single ... employee who worked from there, at
the time this suit was filed, constitutes a place of business belonging to
[defendant]"); *Zaxcom*, 2019 WL 418860, at *5-7 (concluding that remote
employee's home did not constitute a place of business of the defendant under
Section 1400(b)).  That Defendant's website, until recently, advertised that it
had a New York presence (*see* Wu Decl. ¶ 5), does not alter the analysis.  The
Court sees no reason to believe that any outdated representations on

Defendant's website concerning its New York City presence referred to the home office of its single intern.  But even if they did, "the mere fact that [D]efendant has advertised that it has a place of business or has even set up an office is not sufficient[.]"  *In re Cray*, 871 F.3d at 1355.  Just as in *Zaxcom,* where certain of defendant's representatives made public representations that defendant had a New York office, here too the Court concludes that any "such statements are not on their own sufficient to demonstrate that Defendant held out the physical space of [any employee's] home office as a place of its business."  *See Zaxcom*, 2019 WL 418860, at *6.

The present case is easily distinguishable from *RegenLab USA LLC* v. *Estar Technologies Ltd.*, a case referenced by Defendant, in which Judge Andrew Carter found the presence of a single remote employee in this District sufficient to confer venue.  *See* 335 F. Supp. 3d 526 (S.D.N.Y. 2018).  (*See* Def. Br. 9-10).  In *RegenLab*, all of the defendant's employees worked from home, such that "home offices constitute[d] a primary physical location for [defendant's] business."  *Id.* at 549 (citing *In re Cray*, 871 F.3d at 1363 n.1).  In addition, the defendant's employees stored inventory at home, which they used to conduct demonstrations in the district.  *Id.* at 552.  While several considerations in *RegenLab* cut in favor of treating the relevant employee's home office as a "place of the defendant," no such facts exist in this case as to any of Defendant's employees in New York State, let alone its sole intern in New York City.  In contrast to the business model of the defendant in *RegenLab*, Defendant has no specific work-from-home policies and, prior to the COVID-19

22

pandemic, the majority of its employees worked from its San Jose headquarters. (Wu Decl. ¶ 11). Moreover, as of the time of the filing of the instant motion, approximately 80 percent of Defendant's employees in the United States were based in San Jose. (*Id.* at ¶ 7). And to the extent Defendant's New York employees require administrative support, such support would originate from the San Jose headquarters. (*Id.* at ¶ 12).

Underlying the foregoing analysis is the fact that the remote individual in question is Defendant's intern, whose tenure with Defendant lasted just over three months. The Court has not found a single case in which venue was conferred purely through a remote internship. Given the fact that Defendant's only remote worker in this District at the time the Complaint was filed was an intern, and that the record is devoid of any facts indicating that Defendant incentivized the intern (or any other employee) to live in this District, the presence of any of Defendant's remote workers in New York City does not make venue proper in this District.[6]

---

[6]     If the Court were to apply the *Welch* rule, it would potentially consider Or Baron, Meural's Chief Technology Officer, who worked for Defendant until April 2021 and resides in New York City. (Wu Decl. ¶ 8; *see also* Soni Decl., Ex. ix (Or Baron's LinkedIn page reflecting his location in New York City)). Even assuming that two months constitutes a "reasonable time" between the accrual of Plaintiff's claims and the filing of the Complaint, the Court does not believe that consideration of Baron would alter the outcome of the Court's venue analysis. As discussed above, there is no indication that Defendant owned, rented, or leased a portion of any of its New York-based employees' homes, including Baron's, or incentivized any of its employees to live in New York City. (*See* Wu Decl. ¶ 11). Thus, even considering Baron's presence in this District, Defendant's remote workers maintained a limited presence in this District, akin to what the Federal Circuit has previously found insufficient to confer venue. *See, e.g.*, *In re Cray Inc.*, 871 F.3d 1355, 1364-65 (Fed. Cir. 2017) (finding homes of two remote employees did not constitute "places of the defendant" for purposes of patent venue analysis).

### c. Neither the Showfields Micro-Flagship nor the b8ta Locations Confer Venue

Plaintiff also seeks to locate venue in this District as a result of Defendant's relationships with Showfields and b8ta, which, on Plaintiff's view, go "far beyond" that of independent retailers and functionally amount to Defendant's own business locations. (Pl. Opp. 1). Defendant responds that Plaintiff "repeatedly mischaracterizes" these relationships, representing Defendant as in "control" of Showfields and b8ta, when the pertinent agreements circumscribe Defendant's authority over these entities and appoint them as mere independent resellers of its products. (Def. Reply 1). Defendant mounts two primary arguments against Plaintiff's attempt to establish venue based on its arrangements with Showfields and b8ta. *First*, Defendant notes that a time-of-filing standard for determining patent venue renders both relationships irrelevant for venue purposes, as both ended months before the Complaint was filed. (*Id.* at 7, 10). *Second*, Defendant argues that neither the Showfields micro-flagship nor the b8ta locations qualify as "regular and established place[s] of business" under the applicable standard. (*Id.* at 7-10). The Court agrees with Defendant on both counts.

### i. Showfields

Plaintiff argues that Defendant's Showfields micro-flagship remains a "regular and established place of business," in part, because Defendant failed to produce sufficient evidence to prove its relationship with Showfields ended in 2020. (Pl. Opp. 13). In response, Defendant maintains that its relationship with Showfields terminated in approximately April 2020, as reflected by its

Accounts Payable System, which shows that Defendant's last payment to Showfields was made on April 2, 2020, for rent owed for the period March 1, 2020, to March 15, 2020.  (Wong Decl. ¶ 3; *id.*, Ex. A).  Apparently not aware that the relationship had terminated, a Showfields stock associate emailed Defendant in November 2020, asking for a shipment of Defendant's products, to which Defendant responded that it had "closed out with Showfields back in March/April."  (Friday Decl., Ex. B).  Even assuming that Defendant's relationship with Showfields ended in November 2020 (the latest date supported by the record), this occurred more than six months before the Complaint was filed.  Thus, the Showfields micro-flagship cannot confer venue in this District because it did not exist at the time the Complaint was filed.[7]

But even if the Showfields micro-flagship had been active at the time the Complaint was filed, the contours of the agreement demonstrate that it would not constitute a "regular and established place of business" under Section 1400(b).  While Defendant's designated space in the Showfields store surely qualifies as a "physical place in the district," it does not qualify as a regular and established place of business of Defendant.  Critically, Defendant did not have the "regular, physical presence of an employee or other agent of the defendant conducting [Defendant's] business" at the micro-flagship, as necessary for a "regular and established place of business."  *In re Google LLC*,

---

[7]    As discussed *supra* note 5, even under the *Welch* regime, the Court would find the more-than-six-month delay between when Defendant terminated its relationship with Showfields and when Plaintiff filed suit to be an unreasonable delay.  Thus, the Showfields micro-flagship would also not create venue in this District under the alternative accrual standard.

949 F.3d at 1345.  Under the membership plan selected by Defendant in the Showfields Agreement, Defendant was entitled to use a "shared brand host," whom Showfields would hire and train for an extra cost.  (Showfields Agreement § 1.3.2).  The record does not specify whether Defendant, in fact, used one of Showfields's "shared brand host(s)," but even if it did, the Court doubts the brand host would qualify as Defendant's agent for the principal reason that it was Showfields's responsibility to "hire and train" the host.  (*Id.*).  Further, Defendant did not pay the shared brand host directly, as the agreement obligated Defendant to pay Showfields a monthly staffing fee during the term of usage.  (*Id.* at § 3.3).  Without the ability to hire, train, or pay the shared brand host, the agreement did not give Defendant the "right to direct or control" the host's actions as necessary for an agency relationship.  *In re Google LLC*, 949 F.3d at 1345.

The Court also doubts that the micro-flagship is a place "of the defendant," as necessary to confer venue under Section 1400(b).  Plaintiff argues that Defendant "exercises control over the space, including its look and feel, conducts its business there and markets the space as its own."  (Pl. Opp. 14).  Defendant responds that Plaintiff misrepresents the extent of Defendant's control, because Showfields had final control over the styles and quantities of the products sold on the premises.  (*See* Def. Reply 1).  While some of the facts suggest that the Showfields micro-flagship was a "place of the defendant," the balance of factors weighs against such a finding.  On the one hand, Defendant stored inventory at the micro-flagship (Showfields Agreement

26

§ 1.3.2), made representations on its website that it had a micro-flagship in New York (Singer Decl., Ex. J), and played a role in designing the space (*id.*, Ex. K).  On the other hand, Defendant did not own, lease, or possess control over the space in the store.  (*See* Showfields Agreement § 1.1 (giving Defendant a non-exclusive, revocable, and non-transferable license for access to a designated space in the store)).  And while Defendant had input on the design of its designated space (*id.*, § 1.4), Showfields circumscribed and charged for the design services and pre-approved how Defendant intended to use the space (*see id.*, §§ 1.2, 1.4).  Furthermore, Defendant did not condition employment on an employee's residence in the District, as Defendant had no employees working at Showfields.  Although Defendant distinguished the Showfields location from its other places of business by referring to it as a "micro-flagship[,]" it was listed nonetheless as one of Defendant's "proud partners[,]" much like Macy's and Bloomingdales.  (*See* Singer Decl., Ex. J).  On these facts, the micro-flagship was not a place "of the [D]efendant" for purposes of Section 1400(b).

Accordingly, even if the Showfields micro-flagship were operating when the Complaint was filed, it would not have made venue proper in this District.

### ii.     B8ta

Plaintiff separately alleges that venue in this District is proper by virtue of Defendant's "tightly-integrated relationship with b8ta."  (Pl. Opp. 15). Defendant responds that its relationship with b8ta is irrelevant because it terminated in or around February 2021.  (*See* Def. Reply 10; Wong Decl. ¶ 4).

27

As corroboration for the termination of its relationship with b8ta, Defendant produced a report from its Accounts Payable system indicating that its last payment to b8ta was on February 11, 2021, for an invoice dated October 15, 2020, for Q3 rent.  (S*ee* Wong Decl., Ex. B).  The Court credits Defendant's representations that its relationship with b8ta ceased approximately four months before Plaintiff's initiation of this suit.  Thus, based on the facts existing at the time the Complaint was filed, the b8ta locations in New York City do not confer venue in this District.[8]

Even if Defendant's relationship with b8ta were ongoing, the two b8ta locations are not Defendant's "regular and established place[s] of business." Much like the Showfields micro-flagship, the b8ta locations qualify as a "physical place" of business but fail on the remaining elements of the applicable "regular and established business" test.  On the "physical place" prong, Plaintiff has produced photographic evidence showing that b8ta set aside space in their Hudson Yards store location for Defendant's products. (*See* Singer Decl., Ex. W).  The product placement reflected the photograph is comparable to, if not more than, the "leased shelf space or rack space" that can serve as a physical "place" of business.  *In re Google LLC*, 949 F.3d at 1343-44.

---

[8]     Venue would also be improper under the *Welch* standard based on the b8ta locations, as four months is beyond the bounds of what courts have found to be a reasonable delay between the accrual of a patent infringement claim and the commencement of suit.  *See, e.g.*, *Level Sleep LLC*, 2019 WL 458467, at *3 ("Even applying the *Welch* rule, Plaintiffs have not established that Defendants should be held amenable to suit four months after their lease in this district expired.").

Plaintiff points to several facts suggesting that the b8ta locations are Defendant's "regular and established" places of business.  *First*, Plaintiff notes that Defendant's arrangement with b8ta was "not merely temporary[,]" as the Project Plan sets forth a one-year project term, which would automatically renew if neither party terminated the agreement.  (Pl. Opp. 15; Project Plan § 4(a)).  *Second*, Plaintiff asserts that Defendant's "employees are apparently at b8ta locations with regularity[,]" citing to screenshots of YouTube videos from 2017 and 2018 showing Defendant's representatives filming at b8ta locations.  (Pl. Opp. 16; *see also* Singer Decl., Ex. L, M).  *Third*, Plaintiff claims that b8ta operates as Defendant's agent because it sold Defendant's products on a consignment basis.  (Pl. Opp. 16; Project Plan § 6(b)(ii)).  *Fourth*, and finally, Plaintiff highlights that Defendant exercised control over the displays in the store, could change the pricing of its merchandise in real time, and trained b8ta's salespeople on the use of its products.  (Pl. Opp. 16-17; *see* Project Plan §§ 6(a)(i), 6(a)(v), (6)(b)(iv)).

Defendant refutes the existence of an agency relationship between it and b8ta, harping on the facts that all staff present at these locations are b8ta employees and that Defendant neither paid nor controlled any of b8ta's staff.  (Def. Reply 8-9; Friday Decl. ¶ 5).  What is more, Defendant argues that Plaintiff erroneously conflates Defendant's relationship with b8ta locations in places other than New York and that Plaintiff's arguments amount to evidence of nothing more than Defendant's collaboration with b8ta, which does not equate to an agency relationship.  (Def. Reply 9).  Further, Defendant argues

that the word "consignment" in the contract is not enough to establish an agency relationship, especially considering the contract explicitly disclaims an agency relationship.  (*See* NETGEAR Master Showroom Agreement § 12(b) (defining the parties as "independent contractors in the performance of this Agreement")).

While Defendant's relationship with b8ta in New York City is distinct from its relationship with Showfields, the Court concludes that they both fail to confer venue in this District for fundamentally the same reason: the absence of a regular, physical employee or agent of Defendant conducting business at these locations.  *See In re Google LLC*, 949 F.3d at 1345.  Although the Project Plan empowers Defendant to control the content of its displays at b8ta locations and the pricing of its products in real time (Project Plan § 6(a)(i)), Defendant's arrangement with b8ta lacked the physical presence of an employee or agent of Defendant conducting its business at b8ta locations in New York City.  To be sure, the Project Plan contemplates Defendant's and b8ta's collaboration on the design for its product placement (Project Plan § 6(a)(ii)); the execution of a joint marketing plan (*id.*, § 6(a)(vi)); and Defendant's provision of "reasonably detailed training and documentation describing the features, functionalities and use cases" for its products (*id.*, § 6(a)(v)).  Notwithstanding this integration of operations, none of these facts indicates that Defendant had the right to control b8ta or its employees' actions, a critical component of an agency relationship.  Indeed, the Project Plan expressly provides that "b8ta will provide retail staff sufficient for store

operations … including customer assistance, product demonstrations, transactions, workshops and special events during regular operating hours[.]" (*Id.* at ¶ 6(a)(iv)).  Defendant further clarifies that it does not control, employ, or pay any individuals who work for b8ta.  (Friday Decl. ¶ 5).

Plaintiff makes much of the fact that the Project Plan specifies that Defendant's products are provided to b8ta "on a consignment basis," *i.e.*, that Defendant retains title for its products until a consumer purchases it from b8ta.  (*See* Pl. Opp. 16; *see also* Project Plan § 6(b)(ii)).  Because New York law defines a "consignment" as "essentially, an agency with a bailment," Plaintiff argues that this provision confirms that b8ta acts as Defendant's agent.  (Pl. Opp. 16 (citing *United States* v. *Nektalov*, 440 F. Supp. 2d 287, 298 (S.D.N.Y 2006))).  The Court disagrees because the relationship between Defendant and b8ta lacks essential elements of an agency relationship.

As an initial matter, the contract appoints b8ta as an "independent, nonexclusive reseller" of its products and disclaims any agency relationship by classifying the parties as independent contractors vis-à-vis each other. (NETGEAR Master Showroom Agreement §§ 3, 12(b)).  While the "parties' statements in a contract are not dispositive as to the existence of an agency relationship[,]" *Pac. Gas & Elec. Co.* v. *United States*, 838 F.3d 1341, 1359 (Fed. Cir. 2016), the nature of the underlying relationship reveals that Defendant lacked the requisite control over b8ta to establish an agency relationship.  For instance, the Project Plan vested ultimate control in b8ta over the details concerning the placement of Defendant's products, including "without

limitation, display elements, Placement size[,] and Placement components."
(Project Plan § 6(a)(ii).  While b8ta agreed to "collaborate with [Defendant's]
project leader during the design phase to ensure the customer experience is
aligned with [Defendant's] existing brand materials," this hardly reflects
Defendant's control over b8ta's decisionmaking.  (*Id.*).  Further, the contract
permitted Defendant to sell products "as mutually agreed by b8ta and
[Defendant]," which, again, reflects b8ta's retention of control over the
relationship.  (*Id.*, § 6(a)(iii)).  And, as discussed above, the retail staff were b8ta
employees, a fact that is not altered by Defendant's obligation to train them on
the details of its products.  (*Id.*, § 6(a)(iv), (v)).

Ultimately, the relationship that existed between b8ta and Defendant is
best characterized as that of a distributor and an independent reseller.  It did
not involve Defendant's exercise of a sufficient degree of control over b8ta or its
employees to establish an agency relationship.  As such, the b8ta locations
cannot be deemed a "regular and established place" of business of Defendant.
Thus, even if Defendant continued to sell its products at b8ta locations in New
York City as of the date the Complaint was filed, these locations would not
confer venue in this District.

\*          \*          \*

The Court has determined that venue does not lie in the Southern
District of New York.  In opposing the instant motion, Plaintiff also requests
that it be permitted to conduct discovery into the question of venue.  (Pl.
Opp. 6 n.3, 11).  For the reasons just discussed, Plaintiff has not made a *prima*

*facie* showing that venue is proper over Defendant in this District, or that discovery is reasonably likely to yield evidence supporting venue in this District.  *See NetSoc, LLC*, 2019 WL 4857340, at *4-5 (denying plaintiff's request for venue discovery where it "failed to allege fact-specific allegations or evidence that could support a finding that venue is proper" in this District); *see also Chirag* v. *MT Marida Marguerite Schiffahrts*, 604 F. App'x 16, 18-19 (2d Cir. 2015) (summary order) ("Where plaintiffs do not establish a prima facie case that the district court has jurisdiction over the defendant, the district court does not err in denying jurisdictional discovery.").  Therefore, the Court denies Plaintiff's request for venue-based discovery.

## B.     Transfer to the District of Delaware Is in the Interest of Justice

When a case has been brought in an improper district, the Court must either dismiss the case, or "if it be in the interest of justice, transfer [it] to any district or division in which it could have been brought."  28 U.S.C. § 1406(a).  The decision "whether to dismiss or transfer a case 'lies within the sound discretion of the district court.'"  *Blakely* v. *Lew*, 607 F. App'x 15, 18 (2d Cir. 2015) (summary order) (quoting *Minnette* v. *Time Warner*, 997 F.2d 1023, 1026 (2d Cir. 1993)).  Dismissal may be appropriate when the case is a "sure loser on the merits," so as not to "waste the time of another court by transferring it." *Moreno-Bravo* v. *Gonzalez*, 463 F.3d 253, 263 (2d Cir. 2006) (internal quotation marks omitted).  The Court is not now in a position to rule on the merits of this case so as to warrant dismissal.

Thus, believing transfer to be in the interest of justice, the sole remaining issue for the Court is to determine the appropriate venue for transfer. Defendant advocates for the case be transferred to the Northern District of California, which is where Defendant has its headquarters and principal place of business. (Def. Br. 13-22). Plaintiff opposes transfer to the Northern District of California and offers the District of Delaware — where Defendant is incorporated — as an alternative forum. (Pl. Opp. 18-25). Here, the Court believes the interest of justice counsels in favor of transfer to the District of Delaware.

This conclusion is supported by what the Second Circuit has articulated to be the purpose of Section 1406(a), which is to "avoid the injustice which ha[d] often resulted to plaintiffs from dismissal of their actions merely because they had made an erroneous guess with regard to the existence of some elusive fact of the kind upon which venue provisions often turn." *Spar, Inc.* v. *Info. Res., Inc.*, 956 F.2d 392, 394 (2d Cir. 1992) (internal quotation marks omitted) (quoting *Goldlawr* v. *Heiman*, 369 U.S. 463, 466 (1962)). In this respect, at the outset of this case Plaintiff maintained a reasonable belief that venue was proper in this District, considering the representations on Defendant's website that it maintained an office and was actively hiring employees to work in New York City. (*See* Pl. Opp. 10). Indeed, these representations remained until several months *after* the Complaint was filed. Likewise, as of December 3, 2021, well after this litigation was underway, Defendant continued to list Showfields as Meural's micro-flagship location. (*See* Singer Decl., Ex. J). This

34

case does not present circumstances where transfer to Plaintiff's requested alternative forum would "reward [it] for [its] lack of diligence in choosing a proper forum" or permit it to "bargain hunt" forums after it commenced this action. *Spar*, 956 F.2d at 394-95. To the contrary, Defendant's own lack of diligence appears to have contributed to Plaintiff's initial belief that venue was proper in this District.

It is uncontested that venue properly lies in the District of Delaware, as that is where Defendant resides. *See TC Heartland*, 137 S. Ct. at 1517 ("[A] domestic corporation 'resides' only in its State of incorporation for purposes of the patent venue statute."). The Court's discretion to transfer venue to the District of Delaware is further informed by the convenience of the parties, the convenience of the witnesses, and the parties' relative means. *See Rosco, Inc.* v. *Safety Vision LLC*, No. 19 Civ. 8933 (JMF), 2020 WL 5603794, at *3 (S.D.N.Y. Sept. 18, 2020) (outlining factors courts consider when determining whether transfer would serve the interest of justice). Plaintiff is located in New Jersey, and the District of Delaware is the closest jurisdiction where venue over Defendant is proper. (Pl. Opp. 19). Defendant would also be hard-pressed to explain how litigating in its state of incorporation would pose an inconvenience. *See Intell. Ventures I LLC* v. *Altera Corp.*, 842 F. Supp. 2d 744, 756 (D. Del. 2012) ("[A]bsent some showing of a unique or unexpected burden, a company should not be successful in arguing that litigation in its state of incorporation is inconvenient."). Moreover, given the fact that Defendant has declined to exchange patent disclosures, the Court is unable to fully assess where the

balance of evidence and discovery may exist for this case, especially as it pertains to prior artists.  Both parties have represented that they intend to rely on witnesses who live on opposite coasts of the country, meaning that no matter the venue selected, some degree of inconvenience will ensue.  (*Compare* Def. Br. 14-15 (listing several party and non-party witnesses in California), *with* Pl. Opp. 20-22 (same, except in New York and New Jersey)).  The Court additionally notes the existence of a sizable disparity in the means of the parties, which would make cross-country litigation relatively more onerous for Plaintiff.  (*See* Pl. Opp. 24).

Therefore, the Court believes the interest of justice favors transfer to the District of Delaware.

## CONCLUSION

For the foregoing reasons, Defendant's motions to dismiss this case for improper venue and transfer this case to the Northern District of California are DENIED.  However, because venue is improper in this District, the Court, in its discretion, TRANSFERS this case to the District of Delaware in the interest of justice.

The Clerk of Court is respectfully directed to transfer this case to the District of Delaware.

SO ORDERED.

Dated:    July 20, 2022
          New York, New York

_____
KATHERINE POLK FAILLA
United States District Judge